IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 5:21-cv-00051 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| ROCKINGHAM COUNTY SCHOOL BOARD, *et al.*, | ) ) | By:   Hon. Thomas T. Cullen United States District Judge |
| | ) | |
| Defendants. | ) | |

Plaintiff John Doe, a former student at Turner Ashby High School, alleges that Defendants Rockingham County School Board; then-Turner Ashby High School Principal Phil Judd; and a school guidance counselor, Sandy King (collectively, "Defendants") failed to protect him from sexual abuse committed by his former drama teacher, Defendant Wesley Dunlap. This matter is currently before the court on Plaintiff's motion to disqualify Charol Shakeshaft, Ph.D., from serving as an expert witness for Defendants about sexual-assault prevention and training. According to Plaintiff, the court should bar Defendants from using Dr. Shakeshaft because Plaintiff previously engaged her to serve as his expert witness in this case and, in so doing, disclosed privileged communications and attorney work product to her. As explained below, the court will grant Plaintiff's motion and preclude Dr. Shakeshaft from testifying.

## I. RELEVANT BACKGROUND

Plaintiff filed the instant lawsuit on July 15, 2021. Less than a month later, on August 13, 2021, Plaintiff's lead counsel contacted Dr. Shakeshaft, an education professor at Virginia Commonwealth University in Richmond, to gauge her interest in serving as Plaintiff's expert witness in a federal case "against the Rockingham County School Board," as well as a similar matter counsel was litigating in federal court in Pennsylvania. (Emails between Laura E. Laughlin, Pl.'s Att'y, and Dr. Shakeshaft at 6–7 (Aug. 13–23, 2021) [ECF No. 95-1] (on file with the court) [hereinafter 2021 Expert Emails].) In that introductory email, Plaintiff's counsel also briefly summarized the scope of what she hoped Dr. Shakeshaft would cover in her expert testimony. (*Id.*) Dr. Shakeshaft responded to that email several days later, confirming her interest, forwarding a copy of her retainer agreement and curriculum vitae, and suggesting a phone call to discuss both cases. (*Id.* at 4–5.)

On August 30, 2021,[1] Plaintiff's counsel and Dr. Shakeshaft spoke over the phone. What counsel and Dr. Shakeshaft discussed during this call is in dispute. Plaintiff's counsel attests, in a sworn declaration that she later supplemented with a detailed six-page *in camera* filing,[2] that she revealed a trove of confidential information about this case to Dr. Shakeshaft,

---

[1] Plaintiff's counsel represents that this call occurred on August 30, while Dr. Shakeshaft maintains that it took place on August 23. On this disputed point, the court concludes that Plaintiff's counsel is correct. Prior to this call, in an email dated August 19, Dr. Shakeshaft indicated that she was on summer break and would not be back in the office until August 24 and suggested, in another email sent Monday, August 23, that they schedule that call for the following Monday, which would have been August 30. (2021 Expert Emails at 2, 4–5.) In addition, Plaintiff's counsel provided a copy of her calendar entry reflecting a call with Dr. Shakeshaft on August 30. (Reply Mot. Disq. Ex. E [ECF No. 98-5].)

[2] In moving to exclude Dr. Shakeshaft, Plaintiff's counsel expressed her willingness to buttress these sworn, but largely conclusory, representations about the privileged and protected communications shared with Dr. Shakeshaft through an *in camera* filing with specific examples of the information provided during this call. The court, in turn, invited Plaintiff to do so. (ECF No. 94.) Plaintiff's counsel submitted this *in camera* supplement, consisting of a six-page letter detailing what they had discussed during this call and unredacted copies of email

including the substance of privileged attorney-client communications and attorney work product. Dr. Shakeshaft has a different recollection entirely. She recalls that the August 30 discussion was perfunctory, at least as it pertained to this case, and that Plaintiff's counsel shared little-to-no substantive information about the Virginia case, let alone privileged or protected material.

According to Plaintiff's counsel, during this call, Dr. Shakeshaft confirmed that she did not have any conflicts that would preclude her from serving as an expert in either the Pennsylvania or Virginia litigation. Plaintiff's counsel then informed Dr. Shakeshaft that the information that she intended to convey about both cases should be kept confidential. With this understanding, Plaintiff's counsel explained "both cases in detail to Dr. Shakeshaft." (Aff. Laura E. Laughlin at 2 [ECF No. 93-4].) In so doing, counsel represents that her "conversation with Dr. Shakeshaft included confidential and privileged information including but not limited to Plaintiff's counsel's impressions about the case's strengths and possible weaknesses, investigation completed that consisted of attorney work product privileged information, . . . Plaintiff's counsel's case theories and anticipated defenses that will be raised in the litigation, and written discovery and deposition strategy."[3] (Pl.'s Mot. Disq. at 3–4 [ECF No. 93].)

---

correspondence between them. (ECF No. 95.) Defendants, in turn, submitted, *in camera*, a timeline of Dr. Shakeshaft's interactions with Plaintiff's counsel, including unredacted emails that they had exchanged and notes purportedly taken by Dr. Shakeshaft around the time of the call. (ECF No. 97 (on file with the court).)

[3] In her *in camera* submission, Plaintiff's counsel described at least two privileged conversations with her client about key factual allegations and attendant legal issues in this case, which, Plaintiff's counsel represents, she shared with Dr. Shakeshaft during the call. Plaintiff's counsel also specifies that she revealed the substance of five witness interviews she had conducted prior to or shortly after filing the lawsuit. She also represents that she shared key details of her litigation strategy, including for certain depositions and her plan for countering a likely defense at trial. (Letter from Laura E. Laughlin to Hon. Thomas T. Cullen (Sept. 19, 2023) [ECF No. 95] (on file with the court) [hereinafter Laughlin Letter].)

Following that call, in October 2021, Plaintiff's counsel executed a copy of Dr. Shakeshaft's retainer agreement for the Pennsylvania litigation only. But Plaintiff's counsel nevertheless believed that she had retained Dr. Shakeshaft to serve as an expert witness in both cases. As Plaintiff's counsel explains it, because the Pennsylvania matter was much further along than the Virginia case (which had just been filed), she intended first to work with Dr. Shakeshaft to complete her report before the impending expert deadline in the Pennsylvania litigation before turning to the Virginia matter (and, presumably, signing a separate retainer). (Pl.'s Mot. Disq. at 4.)

According to Defendants, the August 30 call "centered around the Pennsylvania case which [Plaintiff's counsel] was handling." (Defs.' Opp'n Mot. Disq. at 4 [ECF No. 96].) Defendants further represent, according to information provided to them by Dr. Shakeshaft, that although Plaintiff's counsel shared "extensive details" about the Pennsylvania matter, she only "provided scant details" about this case and "nothing that could plausibly be considered confidential, work product or privileged." (*Id.*) Defendants point to Dr. Shakeshaft's notes, which they submitted *in camera*, and which Dr. Shakeshaft purportedly made at the time of this call, to corroborate this characterization of the call.[4] Simply put, Defendants, apparently relying

---

[4] According to Dr. Shakeshaft's "contemporaneous notes," Plaintiff's counsel provided a brief overview of the core factual allegations in the Complaint, but, contrary to Plaintiff's counsel's representations, she did not detail the substance of her privileged conversations with Plaintiff, her interviews of potential witnesses, or litigation strategy. (ECF No. 97.) Curiously, as Plaintiff's counsel points out, Defendants' claim that Dr. Shakeshaft takes "copious notes when she is supplied information about a case" is patently contradicted by her standard engagement letter, which cautions that Dr. Shakeshaft "never write[s] on materials sent to [her] nor do[es] [she] take notes." (Reply Mot. Disq. at 6 n.3 [ECF No. 98]; Defs.' Opp'n Mot. Disq. at 11, Ex. 2.)

- 4 -

on what Dr. Shakeshaft has told them,[5] contend that Plaintiff's counsel did not disclose any detailed, privileged, or protected information during the August 30, 2021 call.

But it is undisputed that, following that call, Plaintiff's counsel worked with Dr. Shakeshaft on the Pennsylvania case.[6] Counsel represents, however, that during this period, she and Dr. Shakeshaft occasionally discussed the Virginia matter, although she cannot recall particular details of those conversations. In June 2022, Dr. Shakeshaft emailed Plaintiff's counsel at her new law firm about the Pennsylvania litigation, and, around that time, received payment from Plaintiff's counsel for the Pennsylvania expert report. In response to this email, Plaintiff's counsel informed Dr. Shakeshaft that Dr. Shakeshaft's work on the Pennsylvania matter was largely completed (pending the outcome of summary judgment). (Emails between Laughlin and Dr. Shakeshaft (June 8, 2022) [ECF No. 98-6].) Two weeks later, counsel for Defendants emailed Dr. Shakeshaft about serving as their expert in the Virginia case. It is unclear how Dr. Shakeshaft responded to Defendants' counsel at that time.[7]

---

[5] Plaintiff's counsel also correctly points out that in obtaining this information, including copies of emails between Plaintiff's counsel and Dr. Shakeshaft, portions of which Plaintiff's counsel had redacted as confidential and submitted to the court *in camera*, and in apparently requesting that Dr. Shakeshaft compile a detailed timeline of her interactions with Plaintiff's counsel, Defendants' counsel violated both the letter and spirit of this court's Order. After Plaintiff's counsel first raised the conflict issue, the court entered an Order prohibiting both parties from having additional substantive interactions with Dr. Shakeshaft. (ECF No. 90.) Although the court recognizes that Defendants' counsel needed some information to respond to Plaintiff's motion to disqualify, she should have sought leave of court before seeking it from Dr. Shakeshaft.

[6] In the meantime, this court cancelled the original trial date and stayed discovery because Defendant Wesley Dunlap, Plaintiff's former drama teacher who had pleaded guilty to criminal charges related to Plaintiff's sexual abuse, was still incarcerated and unable to participate in the litigation.

[7] In their response to the instant motion, Defendants' counsel included a copy of her initial June 2022 transmission to Dr. Shakeshaft, but not the expert's response or any follow-up communications from that time. (Email from Heather K. Bardot, Defs.' Att'y, to Dr. Shakeshaft (June 23, 2022) [ECF No. 96-3].) The court assumes that Dr. Shakeshaft responded to this initial email, as Defendants' counsel, in a later email dated April 10, 2023, references this case and previously exchanging emails with Dr. Shakeshaft about it "a while back." (Defs.' Opp'n Mot. Disq. Ex. 1 at 4–5 [ECF No. 96-1].) Curiously, Defendants' counsel also does not reveal what, if anything, Dr. Shakeshaft told her in these initial emails about her prior conversations with Plaintiff's

On February 1, 2023, approximately eight months after Dr. Shakeshaft had last corresponded with Plaintiff's counsel about the Pennsylvania case, Plaintiff's counsel emailed Dr. Shakeshaft about preparing an expert report for this matter, with an eye towards submitting it by the March 30 expert deadline. (Emails between Laughlin and Dr. Shakeshaft at 4–5 (Feb. 1–Mar. 28, 2023) [ECF No. 93-5] [hereinafter 2023 Expert Emails].) Dr. Shakeshaft responded the following day that, due to other expert-witness obligations, she would not be able to meet the March 30 deadline and that "the earliest [she] could get [Plaintiff's counsel] something would be end of May/first week of June."[8] (*Id.* at 4.) Based on Dr. Shakeshaft's representations about her apparent scheduling conflicts, Plaintiff's counsel sought and obtained a deadline extension for her expert report. When counsel emailed Dr. Shakeshaft to inform her that she had secured an extension, Dr. Shakeshaft balked again, this time indicating that she needed to consult with her colleagues to determine if she could even meet a mid-June deadline. Two days later, on March 23, 2023, Dr. Shakeshaft followed-up, expressing her regret that she would be unable to meet a mid-June deadline and providing the names of two colleagues at other institutions who, she indicated, might be good alternatives to "turn to." (*Id.* at 1–2.)

---

counsel on this matter (or her work for Plaintiff's counsel in the Pennsylvania case), including the August 30, 2021 phone call.

[8] Dr. Shakeshaft now claims that she did not recognize the sender of this February 1 email as a former client, but this assertion is belied by her earlier communications with Plaintiff's counsel and her response to that email. Although Plaintiff's counsel had left her prior law firm and was affiliated with the new firm, Messa Law, counsel had already joined that firm by June 2022, or eight months earlier, when she and Dr. Shakeshaft exchanged emails about the status of the Pennsylvania litigation and the outstanding invoice. If Dr. Shakeshaft truly didn't recognize the sender of the February 1 email as an existing (or, at least, a recent) client, presumably she would have indicated as much, as a threshold matter, in her response. Instead, Dr. Shakeshaft responded directly to counsel's specific inquiry in her February 1 email about the March 30 deadline for submitting an expert report in the Virginia matter, indicating that she would need that deadline extended. (2023 Expert Emails at 4.) For these reasons, the court does not find Dr. Shakeshaft's representations credible, at least on this point.

Despite begging off from further work for Plaintiff's counsel due to apparent scheduling conflicts, Dr. Shakeshaft exchanged additional emails with Defendants' counsel less than two weeks later about serving as their expert, and they conducted a conference call towards that end on April 11, 2023. (*See* Defs.' Opp'n Mot. Disq. Ex. 1 at 4–5.) In June, Defendants' counsel executed a written agreement with Dr. Shakeshaft for her to serve as their expert and paid her a $2,500 retainer. (Defs.' Opp'n Mot. Disq. at 6, Ex. 2.) Over the next two months, Dr. Shakeshaft billed Defendant for 58 hours spent reviewing documents and drafting an expert report. (Pl.'s Mot. Disq. Ex. D [ECF No. 93-6].) In September 2023, shortly after Plaintiff discovered that Defendants had retained Dr. Shakeshaft and intended to use her as their expert at trial, he filed the instant motion to disqualify her.[9]

## II. STANDARD OF REVIEW

Federal courts have the inherent power to disqualify expert witnesses to protect the fairness and integrity of the proceedings. *See Koch Refin. Co. v. Boudreaux M/V*, 85 F.3d 1178, 1181 (5th Cir. 1996); *Wang Lab'ys, Inc. v. Toshiba Corp.*, 762 F. Supp. 1246, 1248 (E.D. Va. 1991). A party seeking disqualification bears the burden of establishing that this drastic remedy is warranted under the specific circumstances of the case. *See Koch Refin. Co.*, 85 F.3d at 1181.

---

[9] The relevant factual record has been fully developed through the parties' respective filings to date. Specifically, Plaintiff's counsel, Ms. Laughlin, Defendants' counsel, Ms. Bardot, and Dr. Shakeshaft are the only necessary witnesses to the events underlying this motion, and each provided detailed accounts of their interactions with each other, as set forth in the affidavit, attorney representations, detailed *in camera* submissions, and relevant emails. Having carefully reviewed this record, the court does not believe that a formal evidentiary hearing at which Ms. Laughlin, Ms. Bardot, and Dr. Shakeshaft would testify is necessary or feasible, given continuing privilege and confidentiality concerns—on both sides. Moreover, the parties' arguments are exhaustively laid out in their briefs, and oral argument would not aid in the decisional process.

### III. ANALYSIS

Over the past three decades, courts evaluating expert-disqualification requests have almost uniformly adopted the analytical framework constructed by the court in *Wang Laboratories*. In that case, Judge Ellis recognized a bright-line rule for disqualification in cases where one party engages and shares confidential or protected information with an expert, only to have that expert switch sides and later attempt to serve as an expert for the opposing party in the same matter. *Wang Lab'ys*, 762 F. Supp. at 1248. As Judge Ellis put it, "[N]o one would seriously contend that a court should permit a consultant to serve as one party's expert where it is undisputed that the consultant was previously retained as an expert by the adverse party in the same litigation and had received confidential information from the adverse party pursuant to the earlier retention. This is a clear case for disqualification." *Id.*

But as the court recognized in *Wang Laboratories*, such instances of blatant side-switching are (fortunately) rare. More commonly, courts encounter situations where it is not obvious that the expert was previously and formally retained by the other party in the *same* matter, or when the party opposing disqualification disputes that the other party previously shared confidential or protected information with that expert. In evaluating these murkier scenarios, courts apply *Wang Laboratories'* two-prong inquiry to determine whether disqualification is appropriate.[10] *See Phyllis v. Carlisle*, No. 2:19-cv-565, 2021 U.S. Dist. LEXIS

---

[10] Some courts question whether Judge Ellis intended to construct a separate bright-line rule, as the two-prong analysis largely subsumes the bright-line rule and squarely addresses the determinative issues underlying clear and murky expert-retention scenarios alike. *See, e.g.*, *Rhodes v. E.I. Du Pont de Nemours & Co.*, 558 F. Supp. 2d 660, 664 (S.D. W. Va. 2008) ("On its face, *Wang Laboratories* is unclear whether its approach to expert disqualification constitutes two distinct tests (the bright-line rule and the two-part test), or one test within which the bright-line rule is the extreme."). This is not a clear-cut case, so the court will apply the two-prong analysis.

258187, at * 4 (E.D. Va. Nov. 15, 2021); *Rhodes*, 558 F. Supp. 2d at 666–67. First, the court asks if it was objectively reasonable for the party seeking disqualification to believe that it had a confidential relationship with the expert. *Wang Lab'ys*, 762 F. Supp. at 1248. Second, the court considers whether the party seeking disqualification shared any confidential or privileged information with the expert. *Id.* "Affirmative answers to both inquiries compel disqualification. But disqualification is likely inappropriate if either inquiry yields a negative response." *Id.* Therefore, "even if counsel reasonably assumed the existence of a confidential relationship, disqualification does not seem warranted where no privileged or confidential information passed." *Id.* Relatedly, an expert should not be disqualified unless a confidential relationship has been established in the first instance, even if some confidential information may have been disclosed. *Id.* Stated differently, if an attorney divulges privileged or otherwise protected information about her case to a potential expert before establishing a confidential relationship, she effectively waives any privilege that might otherwise attach. *See id.*

### A. *Wang Laboratories*: Step One

In applying the first prong of the *Wang Laboratories* test, the court focuses on whether the party seeking disqualification "acted reasonably in assuming that a confidential or fiduciary relationship existed." *U.S. ex. rel. Cherry Hill Convalescent Ctr., Inc., v. Healthcare Rehab Sys., Inc.*, 994 F. Supp. 244, 249 (D.N.J. 1997). Although the signing of a confidentiality agreement, the exchange of documents, and the payment of expert-witness fees support the reasonableness of such an assumption, the absence of these formal steps does not necessarily militate the opposite conclusion. This is particularly true where counsel intended for the expert to testify at trial, communicated regularly with her in that regard, and divulged privileged information

and work product during their interactions. *See Hewlett-Packard Co. v. EMC Corp.*, 330 F. Supp. 2d 1087, 1093–94 (N.D. Cal. 2004) (noting that "a confidential relationship can exist absent a confidentiality agreement between the retaining party and the expert"). Indeed, courts have concluded that a confidential relationship existed when "the record supports a longstanding series of interactions, which have more likely than not coalesced to create a basic understanding of [the retaining party's] modus operandi, patterns of operations, decision-making process, and the like." *Koch Refin.*, 85 F.3d at 1182 (quoting *Marvin Lumber & Cedar Co. v. Norton Co.*, 113 F.R.D. 588, 591 (D. Minn. 1986)). At bottom, courts should take a more holistic view to determine if a confidential relationship existed, *see Rhodes*, 558 F. Supp. 2d at 667, recognizing that "[t]he objectively reasonable belief of a confidential relationship is not a 'high hurdle' for the moving party to clear," *Novartis AG v. Apotex Inc.*, No. CIV. 09-5614, 2011 WL 691594, at *2 (D.N.J. Jan. 24, 2011) (quoting *AstraZeneca Pharms., LP v. Teva Pharms. USA, Inc.*, No. CIV. 05-5333, 2007 WL 4292384, at *2 (D.N.J. Dec. 4, 2007)).

Plaintiff's counsel reasonably believed that she had a confidential relationship with Dr. Shakeshaft. In preparing for their introductory call on August 30, 2021, Plaintiff's counsel provided Dr. Shakeshaft with basic information about the Virginia and Pennsylvania litigation, including the identities of the defendants. At the outset of their call, Dr. Shakeshaft confirmed that she did not have a conflict with either representation, and Plaintiff's counsel informed Dr. Shakeshaft that the case information that she would then share was confidential and privileged and should be treated as such.[11] It is undisputed that Dr. Shakeshaft acceded to that

---

[11] Although Dr. Shakeshaft disputes that Plaintiff's counsel shared detailed information, let alone privileged client communications or attorney work product, about the Virginia case during that call, she does not contradict counsel's sworn representation that she told Dr. Shakeshaft that she expected confidentiality. And

- 10 -

condition, insofar as she didn't voice any concerns about honoring requested confidentiality and proceeded to discuss both matters with counsel. *See Wang Lab'ys*, 762 F. Supp. at 1249 ("Balde's silence in the face of receiving this information reenforces the reasonableness of Scott's assumption that a confidential relationship existed.").

Arguably, Plaintiff's counsel could have memorialized this stipulation of confidentiality by executing the engagement letter prior to their August 30 call. But her failure to do so does not undermine the conclusion that there was a meeting of the minds regarding confidentiality. Indeed, as Plaintiff's counsel correctly points out, following a preliminary conflict check, it is customary for a lawyer to have confidential communications with an expert to determine her suitability for this critical role before executing an engagement letter or paying a retainer. (Reply Mot. Disq. at 8.) Provided that the parties reach some accord about the confidentiality of those preliminary case discussions, the absence of these more formal steps does not vitiate that protection. It is therefore unsurprising that Defendants' counsel took exactly this approach in this case when she shared privileged and confidential information with Dr. Shakeshaft during their April 11, 2023 conference call, over two months before she ultimately signed her engagement letter and paid a retainer. (*Id.* at 7–8.)

And Plaintiff's counsel's later communications with Dr. Shakeshaft do not undermine this conclusion. In their email correspondence in February and March 2023, Dr. Shakeshaft implied that she was already familiar with this matter—in contrast to their initial 2021 email correspondence. That she did not (again) forward a copy of her engagement letter or

---

that makes sense, insofar as she acknowledges that Plaintiff's counsel, in fact, divulged confidential information about the Pennsylvania litigation during the same call. It would be silly to suggest that Plaintiff's counsel demanded confidentiality for the one case but not the other.

curriculum vitae in response to Plaintiff's counsel's February 1 email or request basic information to run a conflict check evinces Dr. Shakeshaft's understanding (and acceptance) of her role as Plaintiff's expert in this case and her attendant obligations of loyalty and confidentiality. There is simply no evidence in the record that suggests, let alone establishes, that she had agreed to anything less.[12]

In sum, it was objectively reasonable for Plaintiff's counsel to believe that she had a confidential relationship with Dr. Shakeshaft.

### B. *Wang Laboratories*: Step Two

The second prong focuses on the nature and extent of the information divulged by the moving party. "Confidential information essentially is information 'of either particular significance or [that] which can be readily identified as either attorney work product or within the scope of the attorney-client privilege.'" *Hewlett-Packard Co.*, 330 F. Supp. 2d at 1094 (quoting *Paul ex rel. Paul v Rawlings Sporting Goods Co.*, 123 F.R.D. 271, 279 (S.D. Ohio 1988)). More specifically, confidential information includes "discussion[s] of the [moving party's] strategies in the litigation, the kinds of experts [that party] expected to retain, [the party's] views of the strengths and weaknesses of each side, the role of each of the [party's] witnesses to be hired, and anticipated defenses." *Koch Refin.*, 85 F.3d at 1182 (cleaned up).

---

[12] If Dr. Shakeshaft had truly doubted whether she had been retained in this matter as the result of her initial communications with Plaintiff's counsel in August 2021 and later work for counsel in the Pennsylvania litigation, common sense (and courtesy) dictated that she say as much in her response to counsel's February 1, 2023 email. But instead of challenging that premise, Dr. Shakeshaft picked up right where she and Plaintiff's counsel had left off, indicating that she would need a deadline extension to complete her report for this case.

Applying the second prong, the court is satisfied that Plaintiff's counsel, in fact, shared privileged attorney-client communications and attorney work product with Dr. Shakeshaft.[13] In support of her representation to the court to this effect, Plaintiff's counsel provided an affidavit and six-page *in camera* letter that describes, in detail, the nature and extent of the information shared. This included the substance of two key, privileged communications with her client about a determinative issue in the case. (Laughlin Aff.; Laughlin Letter.) Plaintiff's counsel also attests that she shared with Dr. Shakeshaft details of her litigation strategy, including for written and document discovery and depositions, key findings of her pre- and post-filing factual investigations, and her mental impressions, such as her evaluation of the strengths and weaknesses of Plaintiff's case and, most importantly, her strategy for undermining Defendants' most likely line of defense. (Laughlin Aff.; Laughlin Letter.) This information is paradigmatic attorney work product—both opinion work product and fact work product—that, if kept confidential, is immune from disclosure.[14]

---

[13] The attorney-client privilege protects from disclosure "(1) a communication between client and counsel that (2) was intended to be and was in fact kept confidential, and (3) was made for the purpose of obtaining or providing legal advice." *In re County of Erie*, 473 F.3d 413, 419 (2d Cir. 2007). Federal Rule of Civil Procedure 26(b)(3) partially codifies the work-product doctrine originally recognized by the Supreme Court in *Hickman v. Taylor*, 329 U.S. 495 (1947), in that the rule only applies to "Documents and Tangible Things." But courts have long recognized that attorney work product also encompasses intangible things, including mental impressions, case strategy, and facts obtained by counsel, regardless of whether this material is reduced to writing. *See United States v. Deloitte LLP*, 610 F.3d 129, 134-36 (D.C. Cir. 2010); *United States v. Ghavami*, 882 F. Supp. 2d 532, 539-540 (S.D.N.Y. 2012). Mental impressions, case analyses, litigation strategy, and the like are typically characterized as opinion work product and are immune from disclosure, while facts compiled by lawyers—for example, witness accounts obtained during pre-filing witness interviews or internal investigations—constitute fact work product, which is protected by a limited or qualified immunity that may be overcome upon a showing of substantial need. *See Deloitte*, 610 F.3d at 324; Fed. R. Civ. P. 26(b)(3)(A)(ii).

[14] Of course, had Dr. Shakeshaft honored her agreement and eventually served as an expert witness for Plaintiff, some of these materials might have been subject to disclosure, insofar as she relied on them in forming her opinions. But that is a separate issue entirely and irrelevant for purposes of deciding whether Dr. Shakeshaft should be permitted to jump ship and work for Defendants after learning about Plaintiff's litigation strategy.

Although Defendants argue that Plaintiff's representations on this score are not credible, the court concludes otherwise. An attorney's declaration supported by this level of detail is persuasive for purposes of determining whether an expert should be disqualified. Ms. Laughlin is an experienced attorney and an officer of the court, and it strains credulity to suggest that she would be willing to commit perjury and perpetrate a fraud on the court to disqualify an expert witness. In addition, the court simply does not find Dr. Shakeshaft's dueling representations to be credible—for three reasons. First, as noted above, Dr. Shakeshaft's purportedly contemporaneous notes indicate that the August 30, 2021 call occurred a week before it actually did, as demonstrated by the corresponding emails between herself and Plaintiff's counsel and Plaintiff's counsel's calendar entry. Second, Defendants' characterization of this expert being an assiduous and prolific notetaker is flatly contradicted by the disclaimer in the expert's own engagement letter, wherein she advises that, as a practice, she does not take notes.[15] Third, insofar as the court does not believe Dr. Shakeshaft's representation that she did not recognize the identity of Plaintiff's counsel when counsel emailed her on February 1, 2023, this causes it to question the veracity (or, at a minimum, the accuracy) of Dr. Shakeshaft's other representations about what she had discussed with Plaintiff's counsel in August 2021. In short, given the choice between the accounts proffered by Plaintiff's counsel and Dr. Shakeshaft, the court, in its discretion and for the reasons cited, chooses the former.[16] Plaintiff satisfies the second prong of the *Wang Laboratories* test.

---

[15] The fact that any such notes might later be subject to disclosure suggests that this disclaimer, rather than the subsequent and self-serving characterization of her notetaking, reflects her actual practice.

[16] In reaching this conclusion, the court has considered that Plaintiff's counsel inaccurately stated, in her February 1 email to Dr. Shakeshaft, that the parties had almost completed depositions, when, in actuality, fact discovery was nearly completed, but depositions had not yet occurred. Counsel concedes that she misspoke

### C. Policy Considerations

Policy considerations also militate disqualifying Dr. Shakeshaft. In applying the two-part test, the court should also "balance the competing policy objectives"—specifically, guarding against actual conflicts of interest and maintaining the integrity of the proceedings, while ensuring that the parties have access to experts with specialized knowledge related to the claims at issue. *See Cordy v. Sherwin-Williams Co.*, 156 F.R.D. 575, 580 (D.N.J. 1994). Relatedly, the court should consider whether other experts are available and whether the opposing party will be unduly burdened in having to retain another one. *Cherry Hill*, 994 F. Supp. at 251. And courts should be wary of lawyers seeking to engage multiple experts to prevent the opposing parties from securing their own. *Wang Lab'ys*, 762 F. Supp. at 1248.

The serious nature of the conflict of interest in this case, if unaddressed, would cause irreparable harm to Plaintiff while undermining the fairness and integrity of these proceedings. Those interests substantially outweigh any prejudice to Defendants, particularly given that the trial of this matter has been continued for a year, discovery is ongoing, and there is still ample time to secure another expert in this specialized, but widely studied, field.[17] Finally, there is no indication that Plaintiff engaged Dr. Shakeshaft to thwart Defendants from hiring her. In sum, disqualification reflects the pertinent policy considerations.

---

with respect to the status of the depositions. This inaccuracy, which was largely immaterial, does not, in the court's mind, undermine counsel's credibility on the issue before the court. And insofar as Defendants' counsel suggests that Plaintiff's counsel has misrepresented the state of the evidence on a key factual point of contention—whether certain school administrators had actual knowledge of the sexual abuse when it was occurring—the court concludes, based in part on the materials submitted by Plaintiff's counsel *in camera*, as well as other evidence in the record, that this is unfounded. Contrary to Defendants' counsel's representations, there is conflicting evidence on this issue.

[17] Indeed, as Dr. Shakeshaft indicated in her March 23 email to Plaintiff's counsel, there are other education professors who could fill this role for Defendants.

## IV. CONCLUSION

For these reasons, Plaintiff's motion to disqualify will be granted and Dr. Shakeshaft will be precluded from serving as an expert witness in this case. To mitigate any additional harm to Plaintiff, the court will prohibit Defendants' counsel from having further contact with Dr. Shakeshaft on this matter, or from making direct or indirect use of any information or work product previously provided by her.[18]

The clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to all counsel of record.

**ENTERED** this 10th day of October, 2023.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE

---

[18] But the court declines Plaintiff's counsel's invitation to declare that Defendants' counsel should not be obligated to pay Dr. Shakeshaft's outstanding invoice, given that this problem was largely one of Dr. Shakeshaft's making. The court has neither the inclination nor the authority to excuse Defendants' counsel from her remaining contractual obligations, if any.