CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
March 04, 2025
LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## HARRISONBURG DIVISION

| | | |
|---|---|---|
| John Doe, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 5:21-cv-00051 |
| | ) | |
| Rockingham County School Board *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiff John Doe alleges that he was sexually abused by his choir teacher, Wesley Dunlap, while he was a student at Turner Ashby High School in Rockingham County, Virginia. Doe brought this lawsuit against Dunlap, the Rockingham County School Board ("RCPS"),[1] and two school officials: Phil Judd, the head principal at Turner Ashby, and Sandy King, a school guidance counselor. His surviving claims against RCPS, Judd, and King (Counts I–IV of his complaint) allege causes of action under Title IX of the Education Amendments of 1972, 42 U.S.C. § 1983, and state common law. Doe claims that school officials were aware that Dunlap cultivated an inappropriate sexual relationship with him and failed to take adequate steps to protect him from harm.

This matter is before the court on a motion for summary judgment filed by RCPS, Judd, and King (for purposes of this motion, "Defendants"). (Dkt. 113.) For the reasons discussed below, the court will grant Defendants' motion.

---

[1] The Rockingham County School Board does business as Rockingham County Public Schools.

## I.    Background

### A. Factual History

The following material facts are taken from the summary judgment record and, unless otherwise stated, are undisputed.

#### 1. Wesley Dunlap's sexual contact with Doe

Doe attended Turner Ashby High School from 2016 until his graduation in June 2020. (Dep. of John Doe, Apr. 25, 2023, at 19:3–4, 45:15–20 (Dkt. 124-1) [hereinafter "Doe Dep."].) Wesley Dunlap was the choral director at Turner Ashby, and Doe was a student in several of his classes. (*See id.* at 49:5–13; Dep. of Wesley Dunlap, Apr. 24, 2023, at 49:8–18 (Dkt. 124-6) [hereinafter "Dunlap Dep."].)

In the spring of 2019, during Doe's junior year, Dunlap and Doe began exchanging inappropriate, sexual emails and text messages. (Doe Dep. at 132:11–141:7, 159:13–160:19, 212:6–14.) Dunlap also engaged in sexual contact with Doe on school grounds, which at first involved kissing and touching. (*Id.* at 128:4–129:17, 148:17–150:11, 152:22–155:8; Dunlap Dep. at 76:2–13, 127:19–128:18.) On two occasions, Dunlap and Doe had sex away from school grounds. (Doe Dep. at 65:8–22, 155:15–156:20, 160:20–163:8; Dunlap Dep. at 149:20–153:14.) The first of those encounters occurred in May 2019; the second took place in July 2019. (*Id.*) Doe was seventeen years old at the time of both. (*See* Doe Dep. at 65:10–19.) No one else observed any of their sexual encounters. (*Id.* at 150:12–13, 157:1–2, 163:9–11; Dunlap Dep. at 76:10–21, 128:11–12, 154:12–16.) Neither Doe nor Dunlap told anyone about their sexual relationship while Doe was still a student at Turner Ashby. (Doe Dep. at 139:13–141:7,

150:18–151:9, 156:21–22, 163:12–14, 210:14–211:6; Dunlap Dep. at 154:17–156:8, 293:12–294:4.)

The physical contact between Dunlap and Doe ended before Doe started his senior year. (Doe Dep. at 49:19–50:2, 164:7–10; Dunlap Dep. at 158:22–159:20.) Around the time the 2019–2020 school year began, Dunlap tried to "put up a wall" to "[l]imit communication" with Doe. (Dunlap Dep. at 157:22–158:6.) But Doe remained in daily classes and rehearsals with Dunlap, and he believed Dunlap was emotionally manipulating him by alternating between giving him attention and ignoring him. (Doe Dep. at 50:10–54:15.)

That fall, Doe regularly sent Dunlap texts and emails about personal issues and sought emotional support from him. (*See, e.g.*, Dkt. 124-6 at 387–417.)[2] Dunlap forwarded some of those messages to Sandy King, Doe's school counselor. (*See* Dep. of Sandy King, May 3, 2023, at 259:14–262:18, 271:8–272:5, 274:15–24 (Dkt. 124-4) [hereinafter "King Dep."]; *see* Dunlap Dep. at 155:8–20, 193:15–194:20.) In one of the forwarded emails, Doe referred to Dunlap as one of his best friends and asked Dunlap to "be there for [him], especially where [he is] mentally at right now." (King Dep. at 261:22–262:4.) In addition, Doe repeatedly asked King if she could encourage Dunlap "to come talk to him or to show him favor or some attention." (*Id.* at 97:22–98:2.) King asked Doe why he was seeking attention from Dunlap, and Doe explained that Dunlap "felt like a father figure to him and that he understood him and they had this connection with music." (*Id.* at 108:24–109:10.) Based on this information, King and other school officials were "concern[ed] that [Doe] was wanting Mr. Dunlap to be more than

---

[2] The parties have attached loose files to certain deposition transcripts. When citing those files, this opinion cites the page numbers of the relevant docket entry.

a teacher[ and] wanted him to be more of a father figure and to function as a therapist," which "felt inappropriate." (*Id.* at 96:10–19.)

2. <u>Events in November and December 2019</u>

Doe's mental health deteriorated as the school year progressed. (Doe Dep. at 108:9–16.) In November, Dunlap forwarded King messages he had received from Doe in which Doe expressed potentially suicidal thoughts. (*See* King Dep. at 268:7–269:13, 274:7–24.) On November 26, 2019, Doe learned he had not been selected for a part he wanted in a school musical. (Doe Dep. at 111:14–116:17.) Upon learning that news, Doe sent several distressed text messages to Dunlap, who was involved in selecting roles for the musical. (*Id.* at 111:21–112:2, 115:8–120:21.) Doe attempted suicide later that day. (*Id.* at 124:14–18.)

While Doe was hospitalized, his mother looked through his cell phone and found text messages with a person named "Jake." (Dep. of Doe's Mother, June 7, 2023, at 111:20–112:3, 121:8–16 (Dkt. 124-2) [hereinafter "Doe's Mother Dep."].) In the messages, Doe discussed with "Jake" how Doe had gone on a date with a guy he met on Grindr, a dating app, and "Jake" advised him on safe-dating and safe-sex practices. (*Id.* at 112:19–113:13.) They also exchanged "memes" that Doe's mother believed might have sexual connotations. (*Id.*) Doe's mother suspected that "Jake" was really Dunlap because he also asked specific questions about Doe's brother, who Dunlap knew. (*Id.* at 112:11–18, 118:21–119:10.) In addition to the text messages, Doe's mother found Grindr profiles belonging to Doe, Dunlap, and one of Doe's classmates, as well as texts between Doe and "other guys" on the app. (*Id.* at 112:6–10.) At the time, she did not ask Doe about what she found on his phone. (*Id.* at 127:5–14.)

Doe's mother states that she called King and, in voicemail messages, shared that she had "discovered some inappropriate texts" on Doe's phone. (*Id.* at 92:3–93:6.) She "believe[s]" she told King the texts were from Dunlap but does not recall describing them at that time. (*Id.* at 93:7–19.) King says she does not recall Doe's mother ever telling her about the texts or expressing any concerns about a potentially inappropriate relationship between Dunlap and Doe. (King Dep. at 253:21–256:13, 319:20–320:21.)

Doe's mother states that she also called Dunlap, told him she had seen the text messages, and "point blank asked him" if he "d[id] anything to hurt [Doe] or touch him." (Doe's Mother Dep. at 124:21–125:11, 128:5–13.) Dunlap denied having any inappropriate contact with Doe and assured her he "would never do that." (*Id.* at 128:14–17.) A few days later, on December 3, 2019, Doe's mother sent an email apologizing to Dunlap for "lashing out" over the phone, expressed how she "greatly appreciate[d Dunlap] being there for" Doe, and urged Dunlap to "PLEASE, PLEASE don't ignore him in school" because "this is what [Doe] does need." (*Id.* at 157:19–159:7; Dkt. 124-2 at 144.)

Doe returned to school after his suicide attempt around December 2, 2019. (*See* King Dep. at 245:2–246:2.) That day, King spoke to him "about limiting the amount of time he [was] communicating with Mr. Dunlap." (*Id.* at 245:2–8.) She specifically asked him to refrain from contacting Dunlap outside of school hours. (*Id.* at 247:4–9.) King reported this conversation to Doe's mother, who expressed concerns that Doe "ha[d] been pulled from his only support" and said he was "DEVASTATED he couldn't talk to Mr[.] Dunlap." (Dkt. 124-2 at 139.)

Doe's mother believes she also had a phone call with King around December 2.  (Doe's Mother Dep. at 140:1–141:1.)  She says she requested a meeting with King and reiterated that she had "found some inappropriate texts" on Doe's phone.  (*Id.* at 140:14–17.)  She believes she also told King that she had "confronted" Dunlap but says she "didn't go into detail" about the confrontation.  (*Id.* at 140:22–1.)  She states that she also told King during the phone call that she wanted Dunlap and another one of Doe's classmates, ██████████, "to take a step back from" Doe.  (*Id.* at 140:14–17.)  But the next day, December 3, Doe's mother emailed King to share that she had apologized to Dunlap for "lashing out on him."  (Dkt. 124-2 at 145; *see* Doe's Mother Dep. at 93:11–13.)  She explained that she "had a great deal [on her] plate and it all came to a boil and unfortunately lan[d]ed on Mr. Dunlap."  (Dkt. 124-2 at 145.)  She then told King that she had asked Dunlap "to just be himself" with Doe and "please not ignore him."  (*Id.*)

Doe alleges that Judd and King confronted Dunlap about his relationship with Doe around December 2, 2019.  According to Doe, Judd and King told Dunlap that "if anything is going on between you [and Doe], to knock it off."  (Doe Dep. at 101:12–22.)  Doe says Dunlap told him about Judd and King's comment and was crying, shaking, and "freaking out."  (*Id.*)  Dunlap, Judd, and King state that they have no recollection of such a meeting.  (*See* Dunlap Dep. at 181:5–18; Dep. of Phil Judd, Mar. 23, 2023, at 359:2–11 (Dkt. 124-5) [hereinafter "P. Judd Dep."]); King Dep. at 302:23–304:13.)

Judd does say that Dunlap approached him around this same time to share that Doe hung out in his office all the time, was emailing and seeking him out too much, and in turn made him "feel uncomfortable."  (P. Judd Dep. at 327:6–21.)  Judd says this is when he decided

to call a meeting with Doe's mother to get Doe an appropriate level of support from someone other than Dunlap, address Doe's counseling needs, and set boundaries between Doe and Dunlap. (*Id.* at 327:22–328:4.) Judd further instructed Dunlap not to have contact with Doe outside of class and musical rehearsals. (*Id.* at 415:22–416:9.)

On December 5, Phil Judd advised Michele Judd, one of RCPS's compliance officers, about what Dunlap had reported. (Dep. of Michele Judd, May 25, 2023, at 177:23–181:6, 227:3–231:20 (Dkt. 116-9) [hereinafter "M. Judd Dep."]; *see* Dkt. 116-15 at 134–36.) Phil Judd showed her one of the emails Doe had sent to Dunlap, which Dunlap had shared with him. (M. Judd Dep. at 178:21–179:1, 181:23–182:3.) Based on her review of the email, Michele Judd concluded that Dunlap had not violated any RCPS policy; she instead determined that Doe was unstable and needed appropriate support. (*Id.* at 185:4–188:20, 219:16–23.) Michele Judd also discussed the matter with RCPS superintendent Oskar Scheikl, who confirmed he was comfortable with the school's plan to limit Doe's contact with Dunlap outside of classes and rehearsals. (*Id.* at 208:16–209:10; Dep. of Oskar Scheikl, Mar. 30, 2023, at 151:19–155:9, 158:6–14 (Dkt. 116-8) [hereinafter "Scheikl Dep."]; Dep. of RCPS, Apr. 28, 2023, at 172:18–177:17 (Dkt. 116-16) [hereinafter "RCPS Dep."]; *see* Dkt. 116-15 at 137.)

Phil Judd also had an assistant principal search Dunlap's school email account "to make sure that . . . there was nothing inappropriate going on" and that his emails with Doe "were school related and maintain[ed] a certain level of teacher/student professionalism." (P. Judd Dep. at 344:10–345:6.) According to Judd, that review did not uncover anything he felt was inappropriate and only confirmed that Doe "was asking a lot of Mr. Dunlap." (*Id.* at 345:12–

346:5.)  Judd did not ask to review any other communications Dunlap might have had with Doe.  (*Id.* at 346:15–347:14.)

On December 9, Doe's mother met with Judd, King, Assistant Principal Marc Sweigart, and two other counselors to discuss Doe's needs upon re-entering school.  (Doe's Mother Dep. at 145:7–146:2; *see* Dkt. 116-15 at 132.)  The school officials reiterated that Doe needed to stop contacting Dunlap outside of class and musical rehearsals, and they told Doe's mother they would arrange for Doe to attend sessions with Robin Honeycutt, a crisis counselor at the school.  (P. Judd Dep. at 333:15–334:17.)  Neither Doe nor Dunlap was invited to attend the re-entry meeting.  (*Id.* at 333:10–24.)  Doe's mother was unhappy about the decision to limit Doe's access to Dunlap and asked the school to arrange a "closure meeting" for the two of them, but Judd declined that request.  (*Id.* at 343:11–344:3; Dkt. 124-2 at 150.)

Doe's mother states that she also attended a "pre-meeting" with King immediately before the December 9 re-entry meeting.  (Doe's Mother Dep. at 141:10–144:8.)  She says she again told King she found some "inappropriate" text messages from Dunlap on Doe's phone, and this time explained that the texts provided "dating advice" to Doe and included "sexual memes."  (*Id.* at 142:1–14; 144:9–145:6.)  By December 9, Doe's mother had already told King she had apologized to Dunlap for confronting him about the texts, but she says she reminded King of that confrontation during their pre-meeting.  (*Id.* at 142:11–14.)  Doe's mother offered to share screenshots of the messages she had described, but King reportedly told her it was "not necessary."  (*Id.* at 142:15–18; *see id.* at 93:20–94:7.)  King, for her part, says she does not recall whether such a meeting occurred.  (King Dep. at 253:3–8, 254:16–256:5.)  Doe's mother states that she briefly mentioned the "inappropriate texts" during the re-entry meeting that

followed this pre-meeting with King but "did not go into detail" with the larger group.  (Doe's

Mother Dep. at 147:9–14.)

    3.   Events following December 2019

After he returned to school, Doe continued to meet with King but never told her about

the sexual contacts he had with Dunlap.  (*See* Doe Dep. at 218:2–12, 219:7–220:4, 232:11–21.)

Doe endured mental health challenges for the remainder of his senior year.  (*See* King Dep. at

133:12–24, 153:23–154:2.)  On one occasion in February 2020, Doe was found lying in a fetal

position in the choir hallway.  (Doe Dep. at 240:6–241:6.)  King grew concerned that Doe's

mental health was deteriorating; she shared her concerns with Doe's mother and tried to

connect Doe to in-school and outside counselors and therapists for additional support.  (*See*

King Dep. at 130:6–138:10, 139:24–142:2, 151:4–16; Doe's Mother Dep. at 171:2–19.)  King

and the other counselors she consulted were unable to identify the source of Doe's mental

health challenges.  (*Id.* at 172:10–173:16.)

In the summer of 2020, shortly after Doe graduated from Turner Ashby, he told his

barber, Jimmy Lansberry, that he had kissed and had sex with Dunlap.  (Doe Dep. at 95:16–

96:8; 98:4–18.)  Lansberry was the first person Doe told about the sexual contacts.  (*See id.* at

106:13–17.)  On July 7, 2020, Doe also shared the information with an outside counselor,

Scott Mandeville, and later told his mother and brother.  (*Id.* at 94:3–17, 99:11–17, 105:7–

106:7; Dep. of Scott Mandeville, May 1, 2023, at 35:19–36:13 (Dkt. 116-17) [hereinafter

"Mandeville Dep."].)  Doe's mother says she was unaware of the sexual relations until the

summer of 2020.  (Doe's Mother Dep. at 84:11–86:8, 169:9–13.)

Mandeville reported Dunlap to law enforcement, and Dunlap was arrested and pled guilty to two felony counts of taking indecent liberties in a supervisory capacity. (Mandeville Dep. at 36:2–21; *see* Dunlap Dep. at 222:6–22.) Judd and King both assert that they had no knowledge of Dunlap's sexual misconduct until after he was arrested. (P. Judd Dep. at 318:13–16; King Dep. at 319:20–320:21.)

4. Prior incidents of teacher-on-student sexual misconduct at RCPS

Dunlap was not the first teacher at Turner Ashby who engaged in sexual misconduct with a student. In 2015, a teacher named Michael Stover exchanged sexually explicit photographs with a female student. (P. Judd Dep. at 167:1–170:5, 178:24–179:6.) Judd learned about the incident while investigating a report that Stover might be having an inappropriate relationship with a student. (*Id.* at 157:7–18.) He reported it to the Department of Social Services ("DSS"). (*Id.* at 179:12–19, 182:9–183:10.) The next day, Stover was called into a meeting with Judd and then-superintendent Carol Fenn, at which point he resigned. (*Id.* at 190:2–191:8, 194:18–195:12.)

Two years later, in the summer of 2017, Judd received a report that a Turner Ashby coach and gym teacher named Charlie Newman had encouraged two female students to kiss. (*Id.* at 223:21–224:15.) Judd contacted then-Title IX compliance officer Suzan Guynn, who directed him to speak with the parent who had initially reported the misconduct. (*Id.* at 227:14–229:1.) While investigating the matter, Judd learned of other allegations against Newman, including claims that he had female students in his office in the boys' locker room, put his arm around a female student, and touched a female student when demonstrating how to do exercises. (*Id.* at 235:21–237:5.) Judd reported the allegations to DSS, who declined to

investigate.  (*Id.* at 240:16–241:17.)  Guynn had Judd speak with Newman to set expectations for his future behavior, which included never having female students in his office, not having any contact with the two students he had encouraged to kiss, and generally being "more aware of his actions around female students."  (*Id.* at 244:22–245:2, 250:21–251:6.)  Around October 2017, Judd received another report involving Newman, this time from students who had "overheard some girls talking about how Mr. Newman touched them in gym class."  (*Id.* at 259:14–18.)  Judd investigated and learned the students in question had alleged that Newman touched one girl to adjust her position during weightlifting and braided one girl's hair during class.  (*Id.* at 261:6–12, 264:5–10, 266:1–267:23.)  At Guynn's direction, Judd issued a written reprimand to Newman.  (*Id.* at 268:9–270:15.)

Later that year, the local Sheriff's Department received and investigated a report that Newman had sexually assaulted a female student.  (*Id.* at 274:24–275:5, 282:16–23.)  As a result of that investigation, RCPS superintendent Oskar Scheikl first learned about the earlier investigations into Newman's conduct (Scheikl had started as superintendent in July 2017).  (*Id.* at 274:21–275:12.)  Scheikl was "not happy" that he had not been informed of the earlier investigations and made clear that he and assistant superintendent Doug Alderfer needed to know about similar incidents moving forward.  (*Id.* at 273:2–11, 279:9–14.)  Alderfer and Judd interviewed the student who was the subject of the alleged sexual assault.  (*Id.* at 281:24–283:3.)  She reported that Newman frequently hugged her and once kissed her on the forehead, and that other students told her that Newman had made inappropriate comments about her body.  (*Id.* at 284:3–17.)  RCPS waited for additional information from the Sheriff's Department

before making a disciplinary decision.  (Dep. of Douglas A. Alderfer, Mar. 7, 2023, at 228:14–229:21 (Dkt. 124-12) [hereinafter "Alderfer Dep."].)

In December 2017, the Sheriff's Department informed RCPS that Newman was being charged with sexual battery.  (Dkt. 116-15 at RCPS 3002.)[3]  RCPS first placed Newman on administrative leave, and then allowed him to retire on the condition that he agree to the revocation of his teaching license.  (Alderfer Dep. at 234:12–23; Scheikl Dep. at 344:12–347:22.)  Scheikl removed Guynn from her position as RCPS's human resources director/compliance officer because she had failed to inform him about the prior allegations against Newman.  (Scheikl Dep. at 86:9–87:4.)  RCPS also engaged outside counsel, E. Kate Fitzgerald, to conduct a review of how the Newman matter was handled.  (Id. at 308:20–309:20.)

Teacher-on-student sexual misconduct also occurred elsewhere in the school district.  At the end of the 2018–2019 school year, Scheikl learned of an allegation that an RCPS elementary school teacher named Mike Rice had secretly videotaped female students changing in his classroom.  (Id. at 180:4–185:6.)  Scheikl directed the school principal who reported the incident to confiscate Rice's phone and contact law enforcement.  (Id. at 194:19–24.)  Rice resigned and was criminally charged, convicted, and lost his teaching license.  (Id. at 207:8–208:4.)  Following the Rice incident, Scheikl had a debriefing meeting with the Commonwealth's Attorney and Sheriff's Department to discuss best practices for investigating reports of sexual misconduct.  (Id. at 214:8–216:3; 225:8–226:20, 227:7–229:6.)

---

[3] Some of Defendants' exhibits include numerous loosely organized files related to RCPS trainings and the investigations into prior incidents of sexual misconduct.  This opinion cites the Bates numbers of documents in those files.

5.  <u>RCPS's policies and training</u>

During the relevant period, RCPS had a school board policy for staff that addressed employee-student boundaries, as well as one prohibiting harassment and retaliation.  (Dkt. 116-10 at RCPS 122–26, 146–53; RCPS Dep. at 78:8–20, 89:17–90:9.)  The latter defined and provided several examples of prohibited sexual harassment, discussed how to report concerns related to harassment, and walked through the Title IX complaint and investigation process. (*See* RCPS 145–53.)  Dunlap and all other employees were required to review and acknowledge RCPS's boundaries and harassment policies when hired.  (M. Judd Dep. at 112:17–113:21; *see* Dunlap Dep. at 81:17–82:21, 289:14–18.)  RCPS also had a student version of the sexual harassment policy that provided similar guidance.  (*See* Dkt. 116-10 at RCPS 86–93; RCPS Dep. at 78:8–12.)

RCPS provided employees with several trainings on those topics.  During new-teacher orientations, the school board's attorney presented on teacher-student boundaries and sexual harassment/Title IX.  (M. Judd Dep. at 113:7–11; *see* Decl. of Douglas A. Alderfer ¶ 9 (Dkt. 116-6) [hereinafter "Alderfer Decl."].)  Every year, RCPS required teachers and other staff to complete annual training that addressed boundaries and sexual harassment.  (Scheikl Dep. at 33:2–12; *see* Alderfer Decl. ¶ 9.)  The trainings covered how to recognize and report harassment.  (Alderfer Dep. at 32:12–20, 36:2–12.)  School administrators also provided sexual harassment training to teachers and staff during back-to-school faculty meetings.  (P. Judd Dep. at 61:18–63:3, 70:11–17.)  During the back-to-school training with Turner Ashby staff in 2015, after the Michael Stover incident, Judd emphasized the need to report suspected sexual misconduct to school administrators.  (*Id.* at 206:2–20, 208:1–17.)

Initially, some of the annual sexual harassment and boundaries trainings were offered as online modules. (Scheikl Dep. at 34:11–35:1.) In 2018, as a result of the Charlie Newman investigation, RCPS decided to conduct the trainings in-person to promote better dialogue. (*Id.* at 35:2–20; Alderfer Dep. at 36:18–37:8.) In August 2018, RCPS gave school administrators an updated training presentation on sexual harassment and boundaries. (Alderfer Dep. at 284:3–286:9; M. Judd Dep. at 102:7–14, 109:6–18.) Administrators were instructed to use the same presentation and materials to train staff at their respective schools. (M. Judd Dep. at 115:11–118:15; Alderfer Dep. at 288:11–289:10.)

In August 2018, Phil Judd arranged for the Collins Center, an outside organization that specializes in sexual harassment education, to lead a three-and-a-half-hour training session for Turner Ashby faculty and staff. (P. Judd Dep. at 65:3–67:21.) The session focused on teacher-student boundaries and recognizing and reporting suspected grooming and sexual harassment, and it included discussion about how to respond to real-life scenarios. (*Id.* at 73:24–74:20; M. Judd Dep. at 120:10–15.) Following the Newman incident, Judd also emphasized expectations for appropriate teacher behavior during Turner Ashby faculty meetings. (P. Judd Dep. at 313:14–314:20.)

Judd and other school administrators received their own annual trainings, which addressed how to conduct investigations into alleged sexual harassment. (*Id.* at 63:12–64:24.) Judd received annual trainings on conducting sexual harassment investigations during his time as an administrator at Turner Ashby. (*Id.*) Between 2018 and 2020, Michele Judd completed several additional trainings on Title IX compliance in her capacity as a compliance officer. (M. Judd Dep. at 109:19–110:23; *see* Dkt. 116-12 at RCPS 1457.)

### B. Procedural History

On July 15, 2021, Doe filed this lawsuit against Dunlap, RCPS, Judd, and King. (Compl. (Dkt. 1).)  He also alleged claims against Timeless Toys, LLC, a toy store partly owned by Dunlap, as well as several unnamed Defendants.  (*Id.*)  His complaint included a total of eleven causes of action.  (*Id.* ¶¶ 178–286.)

All named Defendants except for Dunlap filed motions to dismiss under Federal Rule of Civil Procedure 12(b)(6).  Timeless Toys moved to dismiss all claims against it, (Dkt. 25), and RCPS, Judd, and King filed a partial motion to dismiss, (Dkt. 27).  On January 21, 2022, the court entered an order dismissing all counts against Timeless Toys and some of the counts against RCPS, Judd, and King.  (Dkts. 44, 45.)  Four counts against RCPS, Judd, or King survived the motion to dismiss.  Count I alleges that RCPS violated Title IX by failing to act on notice that Dunlap had an inappropriate sexual relationship with Doe.  Count II alleges a § 1983 failure-to-train claim against RCPS, Judd, and King.  Count III alleges a § 1983 claim for supervisory liability against Judd and King.  And Count IV alleges a gross negligence claim against Judd and King.

Following lengthy discovery, RCPS, Judd, and King moved for summary judgment on the four remaining counts.  (Dkt. 113.)  The court heard arguments on the motion on January 15, 2025.  (Dkt. 130.)  Dunlap has not moved for summary judgment on the claims alleged against him.

## II.     Standard of Review

Under Federal Rule of Civil Procedure 56(a), the court shall "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Whether a fact is material depends on the relevant substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If that burden has been met, the nonmoving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

When evaluating a motion for summary judgment, the court considers "the pleadings, depositions, answers to interrogatories, and admissions on file, together with [any] affidavits" filed by the parties. *Celotex*, 477 U.S. at 322 (citation omitted). In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013). The nonmoving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" *Id.* (quoting *Anderson*, 477 U.S. at 252). It may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *See Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874–75 (4th Cir. 1992). To grant summary judgment, "the court must determine that no reasonable jury could find for the nonmoving party on the evidence before it." *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990) (citing *Anderson*, 477 U.S. at 248).

### III.    Analysis

#### A. Title IX Claim

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefit of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  Under Title IX, a plaintiff who was sexually harassed or abused by a public-school employee may sue the school for money damages. *See Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 76 (1992).  To prevail on a Title IX claim based on teacher-on-student sexual harassment, a plaintiff must prove "(1) [he] was a student at an educational institution receiving federal funds, (2) [he] was subjected to harassment based on [his] sex, (3) the harassment was sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity, and (4) there is a basis for imputing liability to the institution." *Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007) (en banc).

Defendants argue that Doe has failed as a matter of law to establish the fourth element. A school district's liability under Title IX is "predicated upon notice to an 'appropriate person' and an opportunity to rectify any violation." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1989) (quoting 20 U.S.C. § 1682).  An "appropriate person" is "an official of the [institution] with authority to take corrective action to end the discrimination." *Id.*  Thus, a "school district is not liable for damages based on sexual harassment of a student by a teacher 'unless an official of the school district who at a minimum has authority to institute corrective measures on the district's behalf has actual notice of, and is deliberately indifferent to, the

teacher's misconduct.'" *Doe v. Russell Cnty. Sch. Bd.*, 292 F. Supp. 3d 690, 708 (W.D. Va. 2018) (quoting *Gebser*, 524 U.S. at 277).

The parties first contest whether Judd and King qualify as "appropriate persons" under Title IX. Their dispute focuses on whether this court is bound by the Fourth Circuit's decision in *Baynard v. Malone*, 268 F.3d 228 (4th Cir. 2001), which held that a Virginia public-school principal was not an "appropriate person" because under Virginia law, principals lack the authority to hire, fire, transfer, or suspend teachers. *Id.* at 239. Doe argues that *Baynard* is no longer good law after the Fourth Circuit's en banc decision in *Jennings v. University of North Carolina*. In *Jennings*, the court determined that a state university's legal counsel was an appropriate person without considering the counsel's hiring or firing authority, which had been central to the court's analysis in *Baynard*. 482 F.3d at 700–01. One judge in this district has agreed that *Jennings* "impliedly overruled" *Baynard*. *See Doe v. Russell Cnty. Sch. Bd.*, No. 1:16-cv-00045, 2017 WL 1374279, at *6 (W.D. Va. Apr. 13, 2017) (Jones, J.) (holding that Virginia public-school principal was an "appropriate person" with authority to take corrective actions despite lack of hiring or firing authority).[4]

The court need not address this question to resolve RCPS's motion for summary judgment on Doe's Title IX claim. Assuming that Judd and King both were appropriate

---

[4] Other district courts in the Fourth Circuit have disagreed on the effect *Jennings* had on *Baynard*'s appropriate-person analysis. *Compare Andrews ex rel. S.H. v. Bd. of Educ. of Prince George's Cnty.*, 513 F. Supp. 3d 648, 654–55 (D. Md. 2021) (concluding that "*Jennings* implicitly overruled *Baynard* as to the Title IX liability analysis, given that the en banc court in *Jennings* did not even give a nod to the *Baynard* standard and that the *Baynard* standard appears far more stringent than the standard for liability recognized by other circuit courts"), *with Rector v. Burnette*, No. 1:24-cv-245, 2024 WL 4876143, at *3 (W.D.N.C. Nov. 22, 2024) (applying the appropriate-person standard from *Baynard*), *Willey v. Bd. of Educ. of St. Mary's Cnty.*, No. DLB-20-161, 2023 WL 3821741, at *4 (D. Md. June 5, 2023) (same).

persons under Title IX, the record would not permit a reasonable jury to find that either had actual notice Dunlap was sexually harassing or abusing Doe.

To prevail on a Title IX claim, a plaintiff must show that "the [school] district itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment *of which it had actual knowledge*." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 642 (1999) (emphasis added). "[A] school has actual notice or knowledge when it is informed or notified of the alleged harassment—most likely via a report."[5] *Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 266 (4th Cir. 2021). Constructive notice or negligence is insufficient to establish Title IX liability. *Gebser*, 524 U.S. at 285; *Davis*, 526 U.S. at 642.

The Fourth Circuit applies an objective standard to determine whether a school official had actual notice of sexual harassment. *Fairfax Cnty. Sch. Bd.*, 1 F.4th at 263. It "asks whether an appropriate official in fact received such a report or complaint and whether a reasonable official would construe it as alleging misconduct prohibited by Title IX." *Id.* at 268. To provide objective notice, a report must "allege that a student 'was currently' being sexually harassed" (though it need not identify the specific victim(s)). *John Doe 2*, 125 F.4th at 505 (quoting *Baynard*, 268 F.3d at 238 n.9). "Reports that support only a general, substantial risk of—or the potential for—ongoing or future misconduct cannot provide actual notice of current sexual harassment."[6] *Id.* (cleaned up). A report that satisfies these conditions

---

[5] In Title IX cases, "'actual knowledge' is sometimes used interchangeably to mean 'actual notice.'" *John Doe 2 v. N.C. State Univ.*, 125 F.4th 498, 503 n.4 (4th Cir. 2025) (citing *Fairfax Cnty. Sch. Bd.*, 1 F.4th at 265–66).

[6] Doe argues that the Fourth Circuit's decision in *Doe v. Fairfax County School Board* shows that a report need only alert school officials to the "possibility" of sexual harassment to provide actual notice. (Pl.'s Mem. in Supp. of Opp. to Defs.' Mot. for Summ. J. at 8, 12 (Dkt. 124) [hereinafter "Pl.'s Mem."].) In *Fairfax County School Board*, the Fourth Circuit noted that the Supreme Court had held that "a complaint from parents of students other than the plaintiff regarding a teacher's inappropriate comments during class 'was plainly insufficient to *alert the principal to the possibility* that [the teacher] was

establishes actual notice "regardless of whether school officials subjectively understood the report to allege sexual harassment or whether they believed the alleged harassment actually occurred." *Fairfax Cnty. Sch. Bd.*, 1 F.4th at 263.

Applying this framework, a reasonable jury could not find that Judd, King, or any other RCPS official had actual notice of Dunlap's sexual harassment while Doe remained enrolled at Turner Ashby. To start, there is no evidence that anyone at RCPS knew about Dunlap's sexual contact with Doe, which began in April 2019 and continued into the summer of that year. Neither Doe nor Dunlap told anyone about their sexual encounters, and no one witnessed any of them. During the 2019–2020 school year, Judd and King knew that Doe frequently sought attention from Dunlap at school and often sent him messages outside of school hours. But most of that information came from Dunlap, who of course concealed his sexual relationship with Doe and instead claimed Doe was "making him feel uncomfortable" by crossing student-teacher boundaries, asking for too much of his time, and seeking his help with personal issues. (P. Judd Dep. at 327:6–328:20.)

Doe argues that his mother provided actual notice of sexual harassment when, in late November and early December 2019, she told King she had discovered "inappropriate" text messages from Dunlap on Doe's phone. Doe's mother recalls three possible exchanges with King about the text messages. She believes she first left voicemails for King to share that she had "discovered some inappropriate texts" from Dunlap to Doe and asking to discuss them

---

involved in a sexual relationship with [the plaintiff]." 1 F.4th at 266 (quoting *Gebser*, 524 U.S. at 291) (emphasis added by Fourth Circuit). The Fourth Circuit then observed: "[i]f actual notice means being 'alerted' to the 'possibility' of sexual harassment occurring, a report alleging such harassment surely is sufficient to establish it." *Id.* However, the Fourth Circuit's recent decision in *John Doe 2* makes clear that a report must do more than inform a school official of the "potential" for sexual harassment to establish actual notice under Title IX. *See John Doe 2*, 125 F.4th at 505.

with King.  (Doe's Mother Dep. at 92:20–93:9.)  She later brought up the "inappropriate texts" in a December 2 phone call with King.  (*Id.* at 140:1–141:1.)  Finally, she described the content of the texts when she met with King immediately before the December 9 re-entry meeting.  At that time, she told King that she had found "some inappropriate texts about [Dunlap] giving dating advice to [Doe]," as well as "some sexual memes."[7]  (*Id.* at 142:3–11; *see id.* at 144:10–145:4.)  During the re-entry meeting with Judd and other school officials, Doe's mother relayed that she and King had "discussed . . . some texts, inappropriate texts" but did not go into more detail.  (*Id.* at 147:9–14.)  The record does not indicate whether she or King ever told Judd that Dunlap had sent the texts in question.  Aside from her communications with King and in the re-entry meeting, she did not discuss the texts with any other school official.  (*Id.* at 94:8–95:1.)

Even when the court draws inferences in Doe's favor, his mother's statements to King would not put a reasonable school official on notice that she was alleging misconduct prohibited by Title IX.  *Fairfax Cnty. Sch. Bd.*, 1 F.4th at 268.  Her first two statements—in her voicemail and in the December 2 phone call, disclosed that Dunlap had sent "inappropriate texts" to Doe, without further elaboration.  That information could indicate a "risk" that

---

[7] The meme in question shows a bent hammer driving a nail into its own handle, with the caption: "When you overthink everything and end up hurting your own feelings."  (Dkt. 124-2 at 209.)  Doe's mother remembers "using [her] hands" to describe the image during her December 9 pre-meeting with King.  (Doe's Mother Dep. at 142:7–9.)

Doe's Mother states that she also told King she had found Grindr profiles for Dunlap and one of Doe's classmates while looking through Doe's phone.  (*Id.* at 142:4–6.)  She evidently did not provide any more detail about Dunlap's Grindr profile during her meeting with King, and it is unclear exactly how the Grindr profile appeared on Doe's phone.  Doe's mother did not, for example, tell King that Doe had "matched" with Dunlap on Grindr or that the two were communicating on the platform.  In his briefing opposing summary judgment, Doe does not mention this fact or argue that it creates a jury question on actual notice.

Dunlap was sexually harassing Doe, but it does not by itself constitute an objective allegation of Title IX-prohibited misconduct.  *John Doe 2*, 125 F.4th at 505.

Further, by the time Doe's mother described the texts to King on December 9, she had conveyed that she *did not* believe Dunlap was engaging in any wrongful conduct with Doe. Soon after she first brought the text messages to King's attention, Doe's mother emailed King to share that she had "confronted" Dunlap and then apologized to him for "lashing out on him."  (Doe's Mother Dep. at 93:11–13; Dkt. 124-2 at 145.)  She told King she had asked Dunlap to "please not ignore Doe."  (Dkt. 124-2 at 145.)  Ahead of the December 9 meetings, Doe's mother also urged King not to restrict Doe's access to Dunlap at school.  On December 2, she emailed King to share that Doe was "DEVASTATED he couldn't talk to Mr. Dunlap." (*Id.* at 139.)  In that email, Doe's mother reported that Doe "said Dunlap has helped him like a father (which he never had)," and she expressed concern that Doe "has been pulled from his only support."[8]  (*Id.*)  Lastly, during the December 9 "pre-meeting" with King prior to the re-entry meeting, Doe's mother reminded King about her confrontation with Dunlap that had prompted her to apologize to him.  (Doe's Mother Dep. at 142:11–14; 144:9–145:6.)

Dunlap's text messages, as Doe's mother described them in the December 9 "pre-meeting" with King, crossed the boundaries for appropriate teacher-student communications. But viewed alongside her other statements to King, Doe's mother's December 9 comments about the text messages cannot "objectively be construed as alleging sexual harassment."

---

[8] Doe's mother testifies that she told King on December 2 and December 9 that she wanted both ████████ and Dunlap "to take a step back" from Doe and give him room as re-entered school.  (Doe's Mother Dep. at 140:14–17, 141:13–142:3.)  That statement appears to be somewhat inconsistent with her earlier statements asking the school not to restrict Doe's access to Dunlap.  Regardless, her request that Dunlap give Doe some space when he returned to school does not support a finding that she notified King of alleged sexual harassment.

*Fairfax Cnty Sch. Bd.*, 1 F.4th at 265.  The Fourth Circuit's recent decision in *John Doe 2* is instructive on this point.  There, the court held that a Title IX plaintiff plausibly alleged actual notice of prohibited conduct where a school official received a report that the offending teacher "was engaging in what he suspected was sexual grooming of male student-athletes." *John Doe 2*, 125 F.4th at 505.  It explained that such a report plausibly provided notice because the term "sexual grooming" necessarily "connotes a distinct and wrongful purpose."  *Id.* at 505–06; *see also Jennings*, 482 F.3d at 700 (holding that Title IX plaintiff created a jury question on actual notice when a university official "was given vivid details of [a coach's] sexual comments about his players" and one victim reported "that the situation was causing her intense feelings of discomfort and humiliation").

Even when viewed in the light most favorable to Doe, Doe's mother's statements to King were much more ambiguous than the specific allegations of sexual misconduct in *John Doe 2* and *Jennings*.  Doe's mother told King that she had apologized to Dunlap and asked the school not to limit his access to Doe.  When placed in this context, Doe's mother's December 9 comments to King would not put a reasonable school official on notice that she was alleging any "wrongful conduct" prohibited by Title IX.  *John Doe 2*, 125 F.4th at 506.  While the text messages she described to King might have suggested "the potential for" misconduct, that is not enough to provide actual notice under Title IX.[9]  *Id.* at 505.

---

[9] Doe's mother claims that she offered to share copies of the text messages but King said it was "not necessary."  (Doe's Mother Dep. at 142:15–18.)  But Doe's mother described the content of the messages to King, which did not provide objective notice that any sexual harassment or abuse was ongoing.  While school officials "cannot escape liability by putting their heads in the sand," their liability turns on actual notice of sexual misconduct, which "is not satisfied by knowledge that something might be happening and could be uncovered by further investigation."  *Doe v. Galster*, 768 F.3d 611, 617–18 (7th Cir. 2014).

Doe also relies on two other facts to establish actual notice, but neither ultimately creates a jury question on the issue.  He first points to Dunlap's alleged December 2, 2019 meeting with Judd and King, during which they reportedly told Dunlap: "if anything is going on between you two, between you and [Doe], to knock it off."  (Doe Dep. at 101:7–22; *see id.* at 175:5–18.)  According to Doe, Dunlap told him about this exchange soon after it took place. (*Id.* at 101:7–22.)

Defendants argue that Doe's secondhand account of the meeting is inadmissible hearsay.  Even if the court admitted this evidence, it would not permit a reasonable jury to find that Judd or King had actual notice of Title IX-prohibited conduct.  For the reasons already discussed, neither Judd nor King ever received a report that provided objective notice of Dunlap's sexual misconduct.  While their comment to Dunlap suggests they had some concerns about his relationship with Doe, a school official's awareness of the "potential for" sexual misconduct, or even a "general, substantial risk of" misconduct, "cannot provide actual notice of current sexual harassment."  *John Doe 2*, 125 F.4th at 505 (cleaned up).  Courts in other jurisdictions have held that similar concerns raised about a teacher's personal relationship with a student do not create a jury question on actual notice absent more specific allegations of sexual misconduct.  *See, e.g., Doe v. Flaherty*, 623 F.3d 577, 581, 585–86 (8th Cir. 2010) (holding that parents' questions to a school principal about claims that "something was going on" between their daughter and her teacher were not sufficient evidence of actual notice); *Doe v. Tippecanoe Sch. Corp.*, No. 4:15-CV-00056, 2017 WL 6395633, at *9 (N.D. Ind. Dec. 14, 2017) (finding insufficient evidence that school officials had actual notice of teacher-on-student sexual misconduct despite the fact that the student's counselors and other parents

voiced concerns about her "close relationship" with the teacher and school officials knew the teacher and student frequently "spent time together between class periods and outside of school").

Second, Doe notes that Judd asked another school employee to search Dunlap's school email account in December 2019 "to make sure . . . that there was nothing inappropriate going on" in his communications with Doe.  (P. Judd Dep. at 344:10–19.)  Judd explains that he ordered the search to see "what kind of things [Doe] was requesting from Mr. Dunlap . . . that were making Mr. Dunlap feel uncomfortable."  (*Id.* at 344:20–345:6.)  Even when the court draws all reasonable inferences in Doe's favor, this, too, suggests only that Judd might have had concerns about the appropriateness of Dunlap and Doe's relationship.  It would not allow a reasonable jury to find that he had actual notice of Dunlap's sexual misconduct.

Judd and King certainly could have been more proactive in investigating Doe's relationship with Dunlap and the sources of his emotional distress during the 2019–2020 school year.  But RCPS can be held liable under Title IX only if a school official received actual notice of Dunlap's sexual misconduct, and Doe cannot establish that either Judd or King had such notice while he was enrolled at Turner Ashby.  Accordingly, the court will grant RCPS's motion for summary judgment on Doe's Title IX claim.

### B.  Failure to Train

Count II alleges a § 1983 failure-to-train claim against RCPS, Judd, and King.  The claim is based on alleged violations of Doe's Fourteenth Amendment substantive due process rights to bodily integrity and to be free from sexual abuse committed by school employees, as well as his property interest in a public education.  (Compl. ¶ 198.)  Doe now concedes that

King is entitled to summary judgment on this claim, as she had no responsibility to train other RCPS employees. (*See* Pl.'s Mem. at 20.) The court therefore will grant King's motion for summary judgment on Count II.

When a plaintiff alleges that a governmental entity's failure to train has caused an employee to inflict an injury, the court must apply "rigorous standards of culpability and causation . . . to ensure that the [entity] is not held liable solely for the actions of its employees." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 405 (1997). A failure to train may serve as the basis for liability under § 1983 only in "limited circumstances." *City of Canton v. Harris*, 489 U.S. 378, 387 (1989). In the school context, a failure-to-train claim requires proof of three elements: (1) a school employee violated the plaintiff's constitutional or statutory rights; (2) supervisors failed to train employees in "deliberate indifference" to the rights of students; and (3) the deficiency in training was "closely related to the ultimate injury." *Russell Cnty. Sch. Bd.*, 292 F. Supp. 3d at 710 (quoting *Harris*, 489 U.S. at 391); *see Brown v. Mitchell*, 308 F. Supp. 2d 682, 701 (E.D. Va. 2004).

The court's analysis of Doe's failure-to-train claim can start and end with the deliberate-indifference element. That element requires proof that school officials had "notice that a course of training is deficient in a particular respect," yet failed to take remedial action. *Connick v. Thompson*, 563 U.S. 51, 62 (2011). Without such notice, "decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* A plaintiff can establish that school officials had notice "by showing that the need for the training and the risks of not providing the training were obvious," *Russell Cnty. Sch. Bd.*, 292 F. Supp. 3d at 711 (citing *Harris*, 489 U.S. at 390), or by showing that school officials

continued to follow "an approach that they know or should know has failed to prevent tortious conduct by employees" in the past, *Brown*, 520 U.S. at 407–08. Doe has not offered enough evidence to prove notice under either method.

### 1. "Obvious" need for training

Doe and Defendants have submitted expert reports that offer conflicting opinions on whether there were any specific deficiencies in RCPS or Turner Ashby's sexual harassment training programs. While the parties debate that question at length, the deliberate-indifference analysis properly focuses on whether school officials had *notice* of training deficiencies. *See Connick*, 563 U.S. at 62.

Here, the record does not indicate there were any obvious deficiencies of which Judd or other RCPS officials should have been aware. Both before and during Doe's enrollment at Turner Ashby, RCPS had staff policies that prohibited sexual harassment and addressed employee-student boundaries. (Defs.' Ex. 10 at RCPS 122–26, 146–53; RCPS Dep. at 78:8–20, 89:17–90:9.) RCPS faculty and staff, including Dunlap, received training on those policies when they began working for the school district and were required to complete sexual harassment and boundaries trainings every year thereafter. (M. Judd Dep. at 112:17–113:21; Dunlap Dep. at 81:17–82:21, 289:14–18; Scheikl Dep. at 33:2–12.) In addition to those recurring training requirements, Judd brought in the Collins Center to lead a three-and-a-half-hour, in-person sexual harassment training for Turner Ashby staff in August 2018. (P. Judd Dep. at 65:3–67:21.) At least some of the trainings included discussions of real-world scenarios to help employees identify signs of sexual harassment or other inappropriate conduct. (*See id.* at 73:24–74:20; M. Judd Dep. at 120:10–15.) Judd supplemented the formal

trainings by emphasizing expectations for appropriate teacher-student behavior during faculty meetings.  (P. Judd Dep. at 313:14–314:20.)  In addition to providing training to teachers and school staff, Judd and other school administrators regularly received their own training on how to investigate reports of sexual misconduct.  (*See id.* at 61:18–64:12.)

Doe questions the effectiveness of these training sessions, but the undisputed record shows that RCPS and Judd made a good-faith effort to regularly train employees at Turner Ashby on identifying, reporting, and, in the case of administrators, investigating sexual misconduct.[10]  Although RCPS and Turner Ashby's training program failed to prevent Dunlap's sexual misconduct,[11] it is readily distinguishable from the type of training programs courts have held to be obviously defective.  *See Russell Cnty. Sch. Bd.*, 292 F. Supp. 3d at 711 (holding that deficiencies in school district's sexual misconduct training were obvious where school employees "received little or no training from [school administrators] on how to identify warning signs of sexual harassment, the steps they should take to prevent sexual harassment, how to investigate complaints, and how to remedy sexual harassment").

2.  Past incidents of sexual misconduct

Nor can Doe demonstrate that RCPS or Judd was deliberately indifferent to known training defects based on past incidents of employee-on-student sexual misconduct in the school district.  Courts have recognized that a plaintiff can satisfy the deliberate-indifference

---

[10] Doe also argues that RCPS and Judd were deliberately indifferent in failing to provide sexual harassment trainings to students and parents.  It is unclear how those alleged gaps in training are relevant to a failure-to-train claim, which specifically focuses on a government body's deliberate indifference to the rights of persons injured *by its employees*.  *See Harris*, 489 U.S. at 387.  Doe does not cite any authority that suggests a school district may be liable under § 1983 for failing to train persons other than its employees.

[11] At the time Dunlap engaged in the sexual contact with Doe, Dunlap was aware that his conduct violated the school's sexual harassment and boundaries policies and potentially violated criminal law.  (Dunlap Dep. at 90:12–91:3, 96:18–97:20, 111:10–112:12, 289:14–292:9.)

element by showing the responsible school official was "aware of, and acquiesced in, a pattern of constitutional violations." *Moody v. City of Newport News*, 93 F. Supp. 3d 516, 538 (E.D. Va. 2015) (internal quotation marks omitted). To establish such a pattern, the plaintiff must show the past incidents were "similar to the violation at issue" such that they "put [the defendant] on notice that specific training was necessary to avoid [the] violation." *Id.* (quoting *Connick*, 563 U.S. at 63).

Defendants argue that the prior incidents of sexual misconduct committed by Turner Ashby teachers (Michael Stover and Charlie Newman) were not sufficiently numerous or similar to Dunlap's actions to establish a "pattern."[12] Even if Doe can demonstrate a pattern of past misconduct based on those incidents, the record would not permit a reasonable jury to find that RCPS or Judd was deliberately indifferent in responding to them. The record shows that RCPS and Judd responded to the Newman incident by introducing changes in 2018 that were designed to improve sexual harassment training for school staff. The school district moved certain trainings from online to an in-person format to better promote dialogue. (Scheikl Dep. at 35:2–9; Alderfer Dep. at 36:18–37:17.) And in August 2018, Turner Ashby faculty and staff received the half-day Collins Center training, which addressed teacher-student boundaries and how to recognize and report grooming and sexual harassment, including through a discussion of real-life scenarios. (P. Judd Dep. at 65:3–67:21, 73:24–74:20.) Doe disputes the effectiveness of those measures. But the fact that school leadership adopted the

---

[12] Doe also cites an earlier incident involving a Turner Ashby teacher named Joseph Burch, who reportedly had an inappropriate sexual relationship with a student at some point between 2004 and 2010. This information appears in a summary of past incidents prepared by Commonwealth's Attorney Alycia Eldridge. (*See* Dkt. 124-22 at RCPS 3822.) Defendants argue that Eldridge's summary lacks a foundation and is inadmissible. Even if considered, the past incident involving Burch would not affect the court's deliberate-indifference analysis.

changes would preclude a reasonable jury from finding that RCPS or Judd acquiesced to past violations committed by teachers. *Cf. Russell Cnty. Sch. Bd.*, 292 F. Supp. 3d at 711 (holding that the plaintiff could establish deliberate indifference through past misconduct where seven school employees had been investigated for sexually harassing students but the school district still failed to provide any real sexual harassment training to teachers or staff).

Finally, Doe argues that Judd and other school administrators had a pattern of improperly investigating reports of teacher-on-student sexual misconduct, which should have put RCPS on notice that it was providing inadequate Title IX training to administrators. He cites two events to support his argument, but neither creates a jury question on deliberate indifference. He first highlights a report from E. Kate Fitzgerald, the outside attorney RCPS engaged to review the school district's handling of the Newman incident. Fitzgerald's report concluded that "the expectations established by [RCPS's Boundaries and Sexual Harassment] Policies are clear, [but] it is less clear how RCPS ensures implementation, enforcement, and on-going training for its staff members and administration." (Report of E. Kate Fitzgerald at 8–9 (Dkt. 124-10).) However, there is no indication that Fitzgerald reviewed any of RCPS's training materials as part of her work (beyond the policies themselves), and her report did not contain any actual analysis of the training program. (*See id.* at 2.)

Doe also focuses on July 2019 correspondence between Scheikl and Commonwealth's Attorney Alycia Eldridge. After RCPS elementary school teacher Mike Rice was reported for secretly filming students changing in the spring of 2019, Eldridge offered to present a training for school administrators on mandatory reporting requirements under Virginia law and best practices in cases involving sexual assault and physical abuse. (Dkt. 124-22 at 97–99; Dep. of

Alycia Eldridge, May 2, 2023, at 122:14–21, 124:9–12 (Dkt. 124-22) [hereinafter "Eldridge

Dep."].)  Scheikl asked Eldridge to provide details about her proposed training ahead of time,

and when she did not, RCPS did not pursue her offer to provide training.  (*See* Eldridge Dep.

at 73:6–74:9, 124:9–12.)  Scheikl's decision not to follow up when Eldridge did not share

details about the proposed training suggests that RCPS could have done more to improve

training for administrators.  However, it does not provide sufficient evidence that the school

district was *deliberately indifferent* to the need to better train administrators.  The undisputed

record shows that RCPS took some action to address flaws in school officials' response to

prior incidents of teacher-on-student sexual harassment.  Scheikl removed Guynn from her

position as RCPS's compliance officer because she did not appropriately handle the Charlie

Newman investigation, and Guynn's replacement, Michele Judd, attended several trainings on

Title IX compliance between 2018 and 2020.  (Scheikl Dep. at 86:9–87:4; M. Judd Dep. at

109:19–110:23; *see* Dkt. 116-12 at RCPS 1457.)   In addition, RCPS provided an updated

training for school administrators in August 2018 in response to the Newman incident.

(Alderfer Dep. at 284:3–286:9; M. Judd Dep. at 102:7–14, 109:6–18.)  Given those facts, a

reasonable jury could not find that RCPS leadership continued to adhere to an approach it

knew was defective.  *See Connick*, 563 U.S. at 62.

Because Doe cannot establish that RCPS or Judd were deliberately indifferent to

known or obvious defects in the school district's Title IX training program, the court will grant

Defendants' motion for summary judgment on Doe's failure-to-train claim.

### C. Supervisory Liability

Count III of Doe's complaint alleges a § 1983 claim for supervisory liability against Judd and King. Doe alleges that Judd's failure to supervise caused violations of his Fourteenth Amendment rights to bodily integrity and to be free from sexual abuse committed by school employees, as well as his educational property rights. (Compl. ¶¶ 204, 210.) Doe now concedes that King is entitled to summary judgment on this claim as well as the failure-to-train claim, (*see* Pl.'s Mem. at 32 n.16), so the court need only determine whether a reasonable jury could find Judd liable.

It is well-established that "supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates." *Baynard*, 268 F.3d at 235 (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)). Such liability "is not premised on *respondeat superior* but on a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984) (citation omitted). To establish supervisory liability under § 1983, a plaintiff must prove three elements:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices[]; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Baynard*, 268 F.3d at 235 (quoting *Shaw*, 13 F.3d at 798) (internal quotation marks omitted).

As to the first element, Doe argues that Judd had actual knowledge of Dunlap's sexual misconduct—he does not rely on a constructive knowledge theory. (*See* Pl.'s Mem. at 34.)

Doe has not offered evidence that Judd had actual knowledge Dunlap was engaging in any wrongful sexual conduct while Doe remained enrolled at Turner Ashby.  As the court discussed when addressing Doe's Title IX claim, there is no evidence that Judd received a report or other information alleging that Dunlap had a sexual relationship with Doe or otherwise had committed any sexual misconduct.  While Doe's mother says she mentioned "inappropriate texts" in the December 9, 2019 re-entry meeting with Judd and others, without more, a reasonable jury cannot conclude that Judd would have objectively understood "inappropriate texts" to evidence sexual harassment committed by Dunlap.

Even if Doe had made a constructive knowledge argument, the record does not support a finding that Judd should have known Dunlap's conduct "posed a pervasive and unreasonable risk" to students like Doe.  "Establishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury."  *Shaw*, 13 F.3d at 799.  Even if a reasonable jury could find that Judd should have known about Doe's mother's statements to King, those statements, standing alone, were too ambiguous to indicate that Dunlap's conduct posed a pervasive and unreasonable risk of harm to Doe.  (*See supra* at 20–25.)

Nor has Doe offered evidence of "documented widespread abuses."  *Shaw*, 13 F.3d at 799.  Judd had no reason to believe that Dunlap had inappropriate communications with Doe or other students on any other occasion.  Judd was aware that a different teacher—Michael Stover—had exchanged sexually explicit photographs with a student in 2015.  But even if Stover's conduct could be classified as similar to Dunlap's reported messages, the Stover

incident falls short of demonstrating that similar conduct had occurred "on several different occasions." *Id.*; *see also Slakan*, 737 F.2d at 373 (stating that a plaintiff ordinarily cannot establish supervisory liability "by pointing to a single incident or isolated incidents").

For similar reasons, Doe also cannot satisfy the second element of a supervisory liability claim, which requires proof that Judd's response to the subordinate's misconduct "was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices." *Shaw*, 13 F.3d at 799 (internal quotation marks omitted). Judd's actions do not meet this "very high standard." *Baynard*, 268 F.3d at 236. Again, Doe has not shown that Judd had either actual or constructive knowledge of qualifying misconduct. Instead, the undisputed facts show that Judd's understanding of the situation was largely shaped by Dunlap, who portrayed Doe as the one responsible for crossing teacher-student boundaries and seeking emotional support from Dunlap that should be sought from school counselors or other professionals. Judd responded to that information by discussing the matter with Turner Ashby's compliance officer, reviewing Dunlap's school email account (which did not reveal any improper communications), and restricting his out-of-class contact with Doe. Given the facts available to Judd at the time, his response does not rise to the level of deliberate indifference, even if he could have taken additional steps to investigate Dunlap's relationship with Doe. *See Jones v. Wellham*, 104 F.3d 620, 627 (4th Cir. 1997) (explaining that a supervisor's actions that in hindsight "were clearly unfortunate," "imprudent," or even "legally negligent" "do[] not suffice" to establish deliberate indifference).

Accordingly, the court will grant Judd and King summary judgment on Doe's supervisory liability claim.

### D. Gross Negligence

Finally, Count IV of Doe's complaint alleges a claim for gross negligence against Judd and King. Under Virginia law, "[g]ross negligence is substantially and appreciably higher in magnitude than ordinary negligence." *Thomas v. Snow*, 174 S.E. 837, 839 (Va. 1934). The Supreme Court of Virginia has defined gross negligence as "a heedless and palpable violation of legal duty respecting the rights of others which amounts to the absence of slight diligence, or the want of even scant care." *Chapman v. City of Va. Beach*, 475 S.E.2d 798, 801 (Va. 1996) (internal quotation marks omitted). It "requires a degree of negligence that would shock fair-minded persons, although demonstrating something less than willful recklessness." *Elliot v. Carter*, 791 S.E.2d 730, 732 (Va. 2016) (citation omitted).

"Ordinarily, the question whether gross negligence has been established is a matter of fact to be decided by a jury," but a court must enter judgment for the defendant "when persons of reasonable minds could not differ upon the conclusion that such negligence has not been established." *Id.* (citation omitted). "Because 'the standard for gross negligence [in Virginia] is one of indifference, not inadequacy,' a claim for gross negligence must fail as a matter of law when the evidence shows that the defendants exercised some degree of care." *Id.* (quoting *Kuykendall v. Young Life*, 261 F. App'x 480, 491 (4th Cir. 2008)).

Here, no reasonable jury could find that Judd or King was grossly negligent in addressing the situation between Doe and Dunlap. As discussed above, neither Judd nor King was aware that Dunlap was sexually abusing or harassing Doe while Doe was enrolled at Turner Ashby. At most, the facts suggest that they had some concerns about Doe's alleged boundary-crossing behavior and close relationship with Dunlap and, in King's case, knew

about the text messages Doe's mother had reported. While Judd and King could have done more to investigate the situation and the reasons for Doe's emotional attachment to Dunlap, they took some responsive action by reviewing Dunlap's school email account, limiting his contact with Doe outside the classroom, and connecting Doe with appropriate counseling resources. Their actions do not demonstrate an "indifference to [Doe] and an utter disregard of prudence that amounts to a complete neglect of [his] safety." *Elliot*, 791 S.E.2d at 732; *see also Colby v. Boyden*, 400 S.E.2d 184, 189 (Va. 1991) (holding that plaintiff failed to establish a *prima facie* case of gross negligence when the record showed that the defendant "did exercise some degree of diligence and due care"). Therefore, Judd and King are entitled to summary judgment on this claim.

## IV.    Conclusion

For the reasons outlined above, the court will grant Defendants' motion for summary judgment on Counts I through IV (Dkt. 113). Defendants RCPS, Judd, and King will be terminated as parties to this action. Doe's claims against Dunlap, who did not move for summary judgment, will proceed to trial.

An appropriate Order will accompany this Memorandum Opinion.

ENTERED this 4th day of March, 2025.

HON. JASMINE H. YOON
UNITED STATES DISTRICT JUDGE